IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA<br><br>*ex rel.*, Willie and Michelle Arnold,<br><br>Plaintiff,<br><br>v.<br><br>HEALOGICS, INC.,<br><br>Defendant. | Civil Action No. 6:14-CV-1064-ORL-37-TBS<br><br>**COMPLAINT**<br><br>**UNDER SEAL**<br>**Pursuant to 31 U.S.C. § 3729** |

## COMPLAINT

*Qui tam* relators Willie and Michelle Arnold ("Arnolds" or "Relators") bring this action under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") on behalf of the United States of America to recover funds of which the federal government has been defrauded. Relators' allegations are based upon their own knowledge, and on an investigation undertaken on their behalf through Counsel. Relators allege as follows:

### I. NATURE OF THE CASE

1. This *qui tam* action is an effort to restore to the United States millions of dollars that the defendant has taken through a systemic, long-lived, and continuing fraud, perpetrated through the Medicare program.

2. Healogics, Inc., the legal entity named herein as the Defendant, is a provider of advanced wound care services with over 500 Wound Care Centers nationwide. Healogics, Inc. is headquartered in Jacksonville, Florida.

3. The Defendant has engaged in three separate schemes to wrongfully enrich itself at taxpayers' expense. First, it engages in a scheme to bypass Medicare's

requirement for certain diagnostic test results before performing hyperbaric treatments on injuries that are below the knee. Specifically, if the results of a patient's Trans-Cutaneous Oxygen Measurement ("TCOM") - a test used to help determine whether a wound will benefit from hyperbaric oxygen therapy - do not reflect that the patient meets Medicare's requirements for treatment, the Defendant hides the results of that test and instead lies to Medicare over the telephone about reasons why hyperbaric treatment is necessary.

4. Second, the Defendant has engaged in a fraudulent scheme to perform 20-40 additional and unnecessary hyperbaric treatments on patients being treated for bone infections. The Defendant does this by pressuring physicians to continue hyperbaric treatment after the IV antibiotics are finished.

5. Third, the Defendant holds regional meetings and seminars in which it instructs physicians to bill Medicare for instances of debridement that do not meet Medicare guidelines.

6. The frauds alleged herein began over seven years ago, and continue to this day.

## II.   PARTIES

7. Relators Willie and Michelle Arnold are citizens of the State of Florida. Mr. Arnold was employed as a hyperbaric technologist at Healogics from July 2008 until September 2012. Mrs. Arnold was employed as a hyperbaric safety director at Healogics from September 2007 until January 2014.

8. Defendant Healogics, Inc. ("Healogics" or "Defendant"), is a corporation organized and existing under the laws of the State of Florida, maintaining its principal

2

place of business at 5220 Belfort Road, Suite 130, Jacksonville, FL 32256. Healogics owns and operates over 500 wound care centers nationwide.

9. The United States of America is the real party in interest under the FCA and ultimately paid the false claims alleged herein through the Medicare program, a federal health insurance program administered by CMS for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh.

## III. JURISDICTION AND VENUE

10. Relators bring this action on behalf of the United States under the *qui tam* provisions of the FCA.

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which confer jurisdiction over actions brought under 31 U.S.C. § 3730.

12. This Court has personal jurisdiction over Defendant, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendant is located, transacts business, and committed violations of the FCA in this district.

13. This action is not based upon a prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other "publicly disclosed" form as that term is defined in 31 U.S.C. § 3730(e)(4)(A).

14. To the extent there has been a public disclosure unknown to Relators, they are original sources under 31 U.S.C. § 3730(e)(4). Relators, prior to any such public disclosure, voluntarily disclosed to the Government the information on which their allegations are based, and/or have knowledge that is independent of and materially adds

3

to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

## IV.  RELEVANT STATUTES AND REGULATIONS

### A.  The False Claims Act

15. The False Claims Act ("FCA") imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("false claim"). 31 U.S.C. § 3729(a)(1)(A). The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2). The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

16. The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

17. The FCA also imposes liability on any person who conspires to commit false claims or false statements ("conspiracy claim"). 31 U.S.C. § 3729(a)(1)(C).

### B.  Medicare

18. Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. It is the nation's largest health insurance program and covers nearly 40 million people. Medicare is administered by a federal agency, namely the Centers for Medicare and Medicaid Services ("CMS"). Medicare pays doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services, including Defendant, according to government-established rates. *Id.*

19. Medicare is divided into several parts, only one of which is relevant to this action. Medicare Part B is the supplementary medical insurance program authorized under Part B of Title XVIII of the Social Security Act that assists in the payment of doctor bills and of outpatient hospital care and various other medical services not covered by Medicare Part A.

20. Medicare Part B covers, among other things, physician services and services and supplies that are furnished incident to a physician's professional services. See 42 C.F.R. § 410.10(a)-(b). Medicare Part B is a retrospective payment system, whereby providers bill Medicare on a per-service basis. Defendant bills Medicare directly under Part B.

21. CMS contracts with fiscal intermediaries to determine and make payments for Part B benefits payable on a cost basis, and with carriers to determine and make payments for Part B benefits payable on a charge basis.

22. Claims for payment submitted to the Government (or a fiscal intermediary of the Government) in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA. By the same token, certifications falsely attesting

5

to compliance with such material requirements constitute false statements for purposes of the FCA.

### C. Medicare's Requirements For Payment

#### 1. Overview of Hyperbaric Oxygen Therapy

23. Hyperbaric Oxygen ("HBO") therapy involves the inhalation of 100% oxygen at an elevated (i.e., greater than sea-level) atmospheric pressure. In the treatment of wounds, this is typically between 2 to 2.5 atmospheric absolute ("ATA"). Originally developed for the treatment of decompression sickness, HBO therapy is used by some physicians in the management of a variety of chronic wounds, such as pressure ulcers, wounds secondary to infection, diabetic foot ulcers, arterial ulcers, traumatic wounds, post-operative wounds, radiation tissue damage, gangrene, and compromised skin grafts. The theory is that wounds have a reduced oxygen supply that impairs wound healing. By delivering oxygen to the body under hyperbaric conditions, tissue oxygen levels are raised to enhance wound healing.

24. Medicare will only reimburse for HBO therapy services which are medically reasonable and necessary. *See e.g.*, 42 U.S.C. § 1395y(a)(1)(A); 42 U.S.C. § 1396–1.

25. Medicare covers HBO therapy under hospital outpatient services, Social Security Act § 1861(s)(2)(B)); physician services (§§ 1861(q), 1861(s)(1)); or incident to physician services § 1861(s)(2)(A)). 42 U.S.C. § 1335(x).

26. The use of HBO therapy is covered as adjunctive therapy only after there are no measurable signs of healing for at least 30 days of treatment with standard wound therapy, and only if the HBO therapy is used in addition to standard wound care. Failure

6

to respond to standard wound care occurs when there are no measurable signs of healing for at least 30 consecutive days.

27. When HBO therapy is initiated, the patient's wounds must be evaluated at least every 30 days. If there are no measurable signs of healing during a 30-day period of HBO treatment therapy, Medicare no longer covers HBO therapy. *See* National Coverage Determination (NCD) for Hyperbaric Oxygen Therapy (20.29) (available at http://www.cms.gov/medicare-coverage-database/details/ncd-details.aspx?NCDId=12&ncdver=3&DocID=20.29&SearchType=Advanced&bc=IAAAABAAAAAA& (last accessed June 19, 2014)).

28. The TCOM is used to assess oxygenation in compromised tissues. During the test, sticky probes are attached to the skin surrounding the wound. These probes measure the oxygen tension in the tissues. The first step of the test measures the tissue oxygenation on room air. Studies have shown that if tissues have an oxygen tension > 30 mmHg[1] in non-diabetics or > 40 mmHg in diabetics, they should heal spontaneously and some other factor (i.e.: poor nutrition, smoking, elevated blood sugar, sub-optimal wound care, etc.) is responsible if they do not.

29. If the oxygen tensions are below these thresholds, the second stage of the test measures the oxygenation of the tissues while the patient breathes 100% oxygen. An increase in tissue oxygenation during this stage indicates that the tissues are getting enough blood flow and HBO should enhance wound healing. An inadequate response to oxygen usually indicates that the patient has some form of arterial insufficiency and may benefit from vascular work-up and intervention.

---

[1] mmHg stands for millimeter of mercury.

30.     Occasionally, if the results of the second stage are inconclusive, a third stage, which consists of breathing 100% oxygen at depth in the chamber, is performed. Again, an increase in tissue oxygenation indicates that HBO might be of benefit, while an inadequate response indicates that it likely won't.

31.     HBO therapy is billed under HCPCS codes C1300 and CPT 99183, which cover Hyperbaric oxygen treatment, and the physician's attendance and supervision, respectively.

### 2.     Overview of Wound Care Debridement

32.     Debridement is the process of removing dead (or devitalized) tissue and/or foreign material from wounds and wound beds, allowing them to heal faster. Dead tissue can trap bacteria, leading to wound infection or odor. Wounds that have dead tissue take longer to heal because new tissue cannot grow. Additionally, dead tissue can hide pockets of pus, which can develop into an infection and prevent a wound from healing. Removing dead tissue on a regular basis keeps it clean and helps the wound grow new tissue.  Because devitalized tissue can impede the healing process, physicians often choose to debride a wound bed as part of the wound treatment process.

33.     Although there are a variety of CPT codes that describe debridement procedures, surgical wound debridement procedures are primarily coded in outpatient settings with CPT codes 11040-11044. The particular codes reported depend upon the types of tissues debrided -- at issue here is CPT Code 11042: Debridement; skin, and subcutaneous tissue.

34.     These codes are distinct from, and should not be confused with the active wound care management codes (97597-97602), which are usually reported by non-

physicians for selective and nonselective debridement procedures, and are not to be reported with codes 11040-11044.

35. Under CPT codes 97597 and 97598, active wound care debridement is performed to remove devitalized and/or necrotic tissue to promote healing of a wound on the skin. These services are billed when an extensive cleaning of a wound is needed prior to the application of dressings or skin substitutes placed over or onto a wound that is attached with dressings. Active wound care management codes do not cover the debridement of subcutaneous tissue.

V.  DEFENDANT'S UNLAWFUL CONDUCT

A.  Background

36. Healogics operates out of Jacksonville, Florida and has contracts with hospitals nationwide to treat their wound care patients using hyperbaric medicine. Patients are referred from the hospitals to Healogics facilities.

37. Doctors at Healogics facilities are either full time "Healogics Doctors" who are employed solely by the Company to work in Company facilities, or physicians with their own practice who contract with Healogics to serve in various roles, up to and including Medical Director for one or more Healogics facilities.

38. The physicians at many Healogics facility, like Dr. P. Phillips Wound Care center, where relator Michelle Arnold worked, are not Healogics employees. Instead, they are local wound care physicians who contract with Healogics to provide their professional services in Healogics facilities to supplement their practice.

39. When these physicians perform services at a Healogics facility, Healogics creates what is called a "super-bill." The super-bill shows which services are billed to

Healogics, like the use of equipment, and which are billed to the physician, e.g. their professional services.

40. Regardless of whether the physicians at a given Healogics facility are independent contractors or full-time Healogics employees, there is a Healogics employee known as a "Program Director" at each facility. That employee has one mandate – to ensure that the HBO chambers are running as much as possible. The Program Director also has the ultimate say over which doctors at a Healogics facility treat which patients.

41. Thus, Healogics has used its status as a gate-keeper to reward those physicians who "play ball" with Healogics' fraud and to reduce or eliminate the income of those who do not. Specifically, Healogics employees do not assign patients to doctors who refuse to participate in Healogics' fraud.

### B. Healogics Fraudulently Bills Medicare for TCOM and HBO that is not Medically Reasonable or Necessary

42. Healogics has a policy of performing a TCOM test on any Medicare patient that has a wound below the knee, whether or not the test is necessary, and whether or not the patient's wound has shown improvement in the last 30 days. Healogics then uses that test to "justify" treating the patient with HBO.

43. Relator Willie Arnold worked at Bartow Wound Care Center, a Healogics facility in Bartow, Florida. He was personally informed by the manager of that facility of this policy.

44. Similarly, Relator Michelle Arnold worked at Dr. P. Phillips Wound Care Center, a Healogics facility in Orlando, Florida, and also noticed that facility performed a TCOM on every Medicare patient with a lower extremity wound.

45. Other individuals further confirmed to Relators that Defendant perpetrates this fraud at its wound care centers as a matter of corporate policy. Specifically, Suemei Addington came to the Tampa office as regional director from Texas in 2012. During the course of Relators' employment, Addington explained that the practice of performing a TCOM on every patient was consistent with her experience in Texas, as well as with her understanding of company policy. Addington is responsible for approximately 12 Healogics facilities in the Tampa area.

46. Typically, the results of the TCOM are submitted to Medicare before making a recommendation about whether a patient should receive HBO.

47. However, Defendant does not bill Medicare for TCOM tests if the results indicate that a patient would not benefit from HBO. This is because Defendant does not want Medicare to know that a TCOM was performed, since the results were unfavorable. Instead, in these cases, Defendant falsifies and then uses other, more easily manipulated means, such as measurements or doctor's notes, for example by claiming that there is an underlying infection. Defendant then uses falsified records to "qualify" the patient for HBO (typically via a phone call to Medicare). Defendant refrains from billing Medicare for the TCOM in order to conceal from Medicare the true condition of the patient's wound.

C. **Defendant Fraudulently Bills Medicare for More Days of HBO Treatment Than are Medically Reasonable or Necessary**

48. Healogics' fraud is particularly egregious when treating patients with chronic refractory osteomyelitis (bone infection). Typically, such infections are treated with, at most, 40 HBO treatments. In such cases, HBO is an adjunctive treatment and the

primary treatment is intravenous antibiotics. When the course of antibiotics is completed, hyperbaric treatments are no longer necessary.

49. Nevertheless, Healogics pressures physicians to continue the HBO treatments, even though the primary treatment – the antibiotic – is no longer being administered. As a result, bone infection patients at Healogics facilities typically receive 60 or 80 treatments, compared to the more usual 20-40.

50. The aforementioned pressure on physicians often comes from a Healogics Program Director. As set forth above, each Healogics facility has a Program Director whose primary responsibility is to see that a certain minimum number of patients are prescribed HBO, and that the chambers stay in regular use. The Program Director often replaces the physician in determining that certain patients should receive HBO.

51. Such practices can be seen in the case of Dr. Michael Cascio. Dr. Cascio has a contract position with Healogics to be the Medical Director for the Wound Care & Hyperbaric Medicine Center at South Seminole Hospital and the Dr. P. Phillips Wound Care Center. Dr. Cascio is also in private practice at Wound Care Physicians of Central Florida (a facility not affiliated with Healogics). Because Dr. Cascio has repeatedly refused to participate in Defendant's fraud, Healogics has taken steps to force him out of his position.

52. Specifically, in recent months, Healogics has forced all physicians to "re-apply" for their positions with the company, and subsequently informed Dr. Cascio that he need not re-apply for his position, as he will not be retained. Dr. Cascio is to be replaced by a full time Healogics employee, over whom the Defendant can assert greater control.

D.  **Defendant Instructs its Employees and Business Associates to Fraudulently Bill Medicare for Debridement that is not Medically Reasonable or Necessary**

53. Additionally, Healogics regularly hosts seminars or meetings for its employees that are intended to provide medical training and continuing education services to physicians, nurses, medical technicians, and other staff in the fields of wound treatment, wound prevention, and disease management.

54. These meetings include a quarterly "D.A.S.H" meeting where Program Directors from each Healogics facility in a region meet Area Vice Presidents – who are regional corporate representatives – to discuss the progress of their facility, billing techniques, ways to identify potential patients, and staff reviews. Information from D.A.S.H. meetings is then disseminated to employees and staff in weekly "Triad" meetings.

55. Defendant uses these seminars to train employees and contracting physicians on ways to circumvent Medicare billing requirements. Specifically, Healogics' seminar presentations emphasize to employees and contracting physicians that they can and should bill for debridement of subcutaneous tissue for the debridement of any wound at a certain depth, whether it is appropriate or not.

56. Specifically, Defendant tells staff that if they debride to a certain depth they can bill Medicare CPT Code 11042, instead of the more appropriate, but less lucrative CPT codes 99597 and 99598.

57. Defendant does this because it receives a percentage of the money paid by Medicare for all procedures that take place in its facilities.

13

58. Relators have worked for several facilities in the region and the abuses are the same at each. In total, Relators believe that at least 50% of the hyperbaric treatments in their region were unnecessary.

## COUNT I

## SUBMISSION OF FALSE CLAIMS TO MEDICARE PART B IN VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)

59. Relators repeat and re-allege each and every allegation contained in paragraphs 1 through 58 of this Complaint as if set forth herein at length.

60. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(C).

61. As a result of the misconduct alleged herein, Defendant knowingly presented, or caused to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

62. As a result of the misconduct alleged herein, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

63. The United States, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so if it had known the truth.

64. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Relators pray that judgment be entered against the Defendant, ordering that:

A. Defendant's assets be frozen until the final resolution of this action;

B. Defendant cease and desist from violating the federal False Claim Act, 31 U.S.C. § 3729, *et seq.*;

C. Defendant pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendant's misconduct;

D. Relators be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d);

E. Relators be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d), and any other applicable law or regulation;

F. Defendant be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

G. The United States and Relators be awarded such other, further or different relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relators hereby demand trial by jury.

Dated: July 1, 2014

Respectfully submitted,

_____
Roland W. Riggs (*pro hac vice* application to be filed)
J. Birt Reynolds (Florida Bar # 10029)
Johnathan P. Seredynski (*pro hac vice* application to be filed)
**MILBERG LLP**
One Pennsylvania Plaza
New York, NY  10119-0165
(212) 594-5300
rriggs@milberg.com
breynolds@milberg.com
jseredynski@milberg.com